1
Kevin F. Ruf (SBN 136901)
**GLANCY PRONGAY & MURRAY LLP**
2
1925 Century Park East, Suite 2100
Los Angeles, California 90067
3
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
4
Email: kruf@glancylaw.com
5
6
Brian P. Murray
Gregory B. Linkh
7
**GLANCY PRONGAY & MURRAY LLP**
230 Park Avenue, Suite 358
8
New York, New York 10169
Telephone: (212) 682-5340
9
Facsimile: (212) 756-3630
Email: bmurray@glancylaw.com
10
Email: glinkh@glancylaw.com
11
*Counsel for Plaintiff*
12
[Additional Counsel on Signature Page]
13

14
**UNITED STATES DISTRICT COURT**

15
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

16
| | |
|---|---|
| GERALD LOVOI, Derivatively on Behalf of HP INC., | Case No. |
| Plaintiff, | |
| v. | |
| DION J. WEISLER, CATHERINE A. LESJAK, ENRIQUE LORES, AIDA ALVAREZ, SHUMEET BANERJI, ROBERT R. BENNETT, CHARLES V. BERGH, STACY BROWN-PHILPOT, STEPHANIE A. BURNS, MARY ANNE CITRINO, TRACY S. KEOGH, STACEY MOBLEY, SUBRA SURESH, CARL BASS, RAJIV L. GUPTA, and MARGARET C. WHITMAN, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| Individual Defendants, | **JURY TRIAL DEMANDED** |
| -and- | |
| HP INC., a Delaware corporation, | |
| Nominal Defendant. | |

17
18
19
20
21
22
23
24
25
26
27
28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Gerald Lovoi ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of Nominal Defendant HP Inc. ("HP" or the "Company") against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment, and violations of § 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by HP with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant HP against Defendants, consisting of the Board and members of upper management. The wrongdoing alleged herein has caused substantial damage to HP's reputation, goodwill, and standing in the business community and has exposed HP to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged HP in the form of, among other things, millions of dollars in losses to the Company's market capitalization.

2.     This action seeks to remedy wrongdoing committed by HP's directors and officers from November 5, 2015 through the present (the "Relevant Period").

3.     HP began operating after spinning off from Hewlett-Packard on November 1, 2015. HP provides computers, printers, and other office supplies, solutions, and services.

4.     The Supplies Division was a division of HP's Printing Division, which was itself a division of HP's Printing Segment. The Supplies Division was a major source of revenue for Hewlett-Packard before the spin-off and continued to be a major source of revenue for HP after the spin-off.

5.      On September 30, 2020, the SEC issued a cease-and-desist order to HP pursuant to section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934 (the "Order"). The Order stated that:

> Beginning in the second fiscal quarter of 2015, certain regional managers at HP used a variety of incentives to accelerate, or "pull-in," sales that they otherwise expected to materialize in later quarters. In addition to the pull-ins, management in one region sold printing supplies to distributors known to be involved in selling the HP printing supplies outside of their territory (internally described as "gray marketing," and known in the region as "A-Business") causing significant margin erosion and cannibalization of HP sales in other regions.

6.      The Order further revealed that:

> Despite the risk that these sales practices could negatively impact HP's operating profit in future quarters, HP did not disclose to the market during the relevant time period that its use of the pull-ins and A-Business were causing decreased margins and increased channel inventory. HP further failed to disclose facts necessary to make its channel inventory disclosures not misleading, including that the channel inventory metric employed by the company in quarterly earnings calls only included channel inventory held by channel partners to which HP sold directly and not by channel partners further down the distribution chain, thereby disclosing only an incomplete picture of HP's channel health.

7.      The Order, which noted that the findings therein were "true and admitted by [HP]," required HP to pay a $6 million civil monetary penalty and to cease and desist from committing or causing any violations of Section 17(a)(2) and (3) of the Securities Act and Section 13(a) of the Exchange Act and Rules 13a-1, 13a-13, 13a-15, and 12b-20 thereunder.

8.      Until the issuance of the Order, the conduct described in the Order was concealed from the public. From November 2015 through June 2016, the Individual Defendants caused the Company to issue materially false and misleading statements regarding the Supplies Division. Specifically, the division's sales practices around the world would eventually lead to an erosion in profits, but the Individual Defendants failed to disclose these sales practices and the effect they would have on the Company's future profits.

9.      The Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct the false and misleading statements and omissions of material fact issued regarding these material business practices during the Relevant Period. The Individual Defendants also willfully or recklessly caused the Company to fail to maintain an adequate system

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

of oversight, disclosure controls and procedures, and internal controls over financial reporting, and failed to hold HP executives and employees accountable for the harm caused by the improper conduct

10. There is an ongoing federal securities class action in this district: *York County On Behalf Of The County Of York Retirement Fund v. HP Inc. et al.*, Case No. 4:20-cv-07835-JSW, (the "Federal Securities Class Action"). Plaintiff in that case alleges that HP's officers and directors violated the federal securities laws by filing false and misleading statements that omitted material adverse facts.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1) and raise a federal question pertaining to the claims made in the Federal Securities Class Action based on violations of the Exchange Act. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

13. This Court has personal jurisdiction over each of the Defendants because each Defendant either resides in this District and/or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

14. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because HP's principal executive offices are located in this district, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

### THE PARTIES

**Plaintiff**

15.     Plaintiff Gerald Lovoi is and has continuously been a stockholder of HP during the wrongdoing complained of herein.

**Nominal Defendant**

16.     Defendant HP is a Delaware corporation with its principal executive offices at 1501 Page Mill Road, Palo Alto, California 94304. HP's shares trade on the New York Stock Exchange under the ticker symbol "HPQ."

**Individual Defendants**

17.     Defendant Dion J. Weisler was the Company's Chief Executive Officer and President from November 1, 2015 until he resigned on November 1, 2019. After his resignation, Defendant Weisler continued to serve as a director until May 12, 2020 when, at the 2020 Annual Meeting of Stockholders, he was not nominated for re-election. For the fiscal year ended October 31, 2018, Weisler received $19,215,534 in total compensation from the Company. During the Relevant Period, Weisler sold over $42 million in HP stock.

18.     Defendant Catherine A. Lesjak served as the Company's Chief Financial Officer from November 1, 2015 until June 30, 2018. For the fiscal year ended October 31, 2018, Lesjak received $7,844,256 in total compensation from the Company. During the Relevant Period, Lesjak sold over $38 million in HP stock.

19.     Defendant Enrique Lores has been the Company's CEO and a director since November 1, 2019. For the fiscal year ended October 31, 2020, he received $12,479,815 in total compensation from the Company. Prior to November 1, 2019, Lores served as HP's President of Imaging & Printing during the Relevant Period. During the Relevant Period, Lores sold over $18 million in HP stock.

20.     Defendant Tracy S. Keogh has served as the Company's Chief Human Resources Officer since November 1, 2015. During the Relevant Period, Keogh sold over $24 million in HP stock.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

21.     Defendant Aida Alvarez has been a Company director since February 8, 2016. For the fiscal year ended October 31, 2020, Alvarez received $311,717 in total compensation from the Company.

22.     Defendant Shumeet Banerji has been a Company director since November 1, 2015. For the fiscal year ended October 31, 2020, Banerji received $331,703 in total compensation from the Company. During the Relevant Period, Banerji sold over $1.3 million in HP Stock.

23.     Defendant Robert R. Bennett has been a Company director and a member of the Audit Committee since November 1, 2015. For the fiscal year ended October 31, 2020, Bennett received $331,703 in total compensation from the Company.

24.     Defendant Charles "Chip" V. Bergh has been a director since November 1, 2015. For the fiscal year ended October 31, 2020, Bergh received $502,036 in total compensation from the Company.

25.     Defendant Stacy Brown-Philpot has served as a Company director and a member of the Audit Committee since November 1, 2015. For the fiscal year ended October 31, 2020, Brown-Philpot received $311,717 in total compensation from the Company.

26.     Defendant Stephanie A. Burns has served as a Company director since November 1, 2015. For fiscal year ended October 31, 2020, Burns received $336,700 in total compensation from the Company.

27.     Defendant Mary Anne Citrino has served as a Company director and Chair of the Audit Committee since November 1, 2015. For the fiscal year ended October 31, 2020, Citrino received $346,693 in total compensation from the Company.

28.     Defendant Subra Suresh has served as a Company director and a member of the Audit Committee since November 1, 2015. For the fiscal year ended October 31, 2020, Suresh received $311,717 in total compensation from the Company.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**Former Directors**

29.     Defendant Carl Bass served as a Company director from November 1, 2015 until September 2017. For the fiscal year ended October 31, 2017, Bass received $310,326 in total compensation from the Company.

30.     Defendant Rajiv L. Gupta served as a Company director from November 1, 2015 until April 2017. For the fiscal year ended October 31, 2017, Gupta received $67,804 in total compensation from the Company.

31.     Defendant Stacey Mobley served as a Company director from November 1, 2015 until April 13, 2021. For the fiscal year ended October 31, 2020, Mobley received $311,717 in total compensation from the Company.

32.     Margaret C. Whitman served as a Company director from November 1, 2015 until July 2017. For the fiscal year ended October 31, 2017, Whitman received $305,049 in total compensation from the Company. During the Relevant Period, Whitman sold over $24 million in HP stock.

33.     Collectively, Individual Defendants Bennett, Brown-Philpot, Burns, Citrino, and Suresh, are referred to herein as the "Audit Committee Defendants."

34.     Collectively, Individual Defendants Weisler, Lesjak, Lores, Keogh, Alvarez, Banerji, Bennett, Bergh, Brown-Philpot, Burns, Citrino, Mobley, Suresh, Bass, Gupta, and Whitman, are referred to herein as the "Individual Defendants."

35.     The Individual Defendants, because of their positions with HP, possessed the power and authority to control the contents of HP's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and/or misleading.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

36.     By reason of their positions as officers, directors, and/or fiduciaries of HP and because of their ability to control the business and corporate affairs of HP, at all relevant times, the Individual Defendants owed HP and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage HP in a fair, just, honest, and equitable manner. The Individual Defendants were required to act in furtherance of the best interests of HP and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to HP and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

37.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of HP, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with HP, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

38.     To discharge their duties, the officers and directors of HP were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of HP were required to, among other things:

  a.     ensure that the Company complied with its legal obligations and requirements— including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

  b.     conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

c.   remain informed as to how HP conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

d.   truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

39.   Further, the Individual Defendants, as officers and/or directors of HP, were bound by the Company's Standards of Business Conduct, updated by the Integrity at HP policy (the "Code of Conduct") which stated the following:

- Integrity at HP is a resource for all employees and members of the Board of Directors. Integrity at HP is the new name for the Standards of Business Conduct. It represents the highest level of guidance for our conduct.

- All of us have a responsibility to do our part to protect our reputation and our company. Take action when aware of misconduct. Every employee has a responsibility to report any alleged misconduct immediately. Use the HP Open Door Policy to raise concerns. Managers must encourage open and honest communication.

- Insist on accurate business records. Accurate records are essential to how we manage our business, maintain compliance with financial reporting regulations, and uphold credibility with both our customers and our stakeholders. Create business records that accurately reflect the truth of the underlying transaction or event. Ensure the financial policies and reporting guidelines in the Accounting and Finance Manual are followed. Where required, obtain approvals and be prepared to provide supporting documentation.

- Stay alert. If accessing records is a regular part of your job, watch for any irregularities that might signal fraud, bribery, or other illegal activity, such as: false entries, discrepancies, omissions, misleading entries, or unrecorded funds. Raise a Concern about any unusual activity immediately. Employees who have questions about records should contact either the Records Information Management team or their department's Records Coordinator or Records Officer.

- Do not trade on material non-public information

- In talking with customers—whether in person or through our advertising, marketing, or sales materials—we provide only truthful information about our products. Do not make false or illegal claims about our competitors and never use deception or misrepresentation to gain an unfair advantage over them.

- We must represent our products and services fairly, accurately, and truthfully. We must not create misleading impressions in any advertising, marketing, or sales materials, or in any presentations and must not make false or illegal claims about competitors or their products and services. We protect the HP brand and marks and use them only with the proper authorization.

40.     Furthermore, the Company's Standards of Business Conduct, which all employees and members of the Board of Directors are required to follow, required HP employees and the Board of Directors to use due diligence in preventing situations that may lead to the gray marketing of HP products.

41.     The Individual Defendants failed to adhere to the Code of Conduct when they failed to disclose the improper sales practices described herein. .

42.     In addition to these duties, the Audit Committee Defendants, who served on the Audit Committee during the Relevant Period, owed specific duties to HP under the Audit Committee Charter (the "Audit Charter"). Specifically, the Audit Charter set forth the following responsibilities of the Audit Committee Defendants:

- To represent and assist the Board in fulfilling its responsibilities for generally overseeing: (a) HP's financial reporting processes and the audit of HP's financial statements, including the integrity of HP's financial statements, (b) HP's compliance with legal and regulatory requirements, (c) the independent registered public accounting firm's qualifications and independence, (d) the performance of HP's internal audit function and independent registered public accounting firm, and (e) risk assessment and risk management;

- To prepare the audit committee report required by the proxy rules of the U.S. Securities and Exchange Commission (the "SEC") to be included in HP's annual proxy statement;

- Meet to review and discuss with management and the independent registered public accounting firm HP's annual audited and quarterly financial statements, including HP's disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations";

- Review and discuss with the independent registered public accounting firm the matters required to be discussed by the independent registered public accounting firm under applicable standards adopted by the Public Company Accounting Oversight Board;

9

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- Review major issues regarding accounting principles and financial statement presentations, including any significant changes in HP's selection or application of accounting principles;

- Review analyses prepared by management and/or the independent registered public accounting firm setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements.

- The Committee will recommend to the Board whether the audited financial statements should be included in HP's Annual Report on Form 10-K.

- The Committee will review and discuss earnings press releases (paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information), as well as corporate policies with respect to financial information and earnings guidance provided to analysts and ratings agencies.

- The Committee will review the adequacy and effectiveness of HP's disclosure controls and procedures.

- The Committee will review the adequacy and effectiveness of HP's internal controls over financial reporting, including any significant deficiencies in such controls and significant changes or material weaknesses in such controls reported by the independent registered public accounting firm, the internal auditors or management, any special audit steps adopted in light of material control deficiencies, and any fraud, whether or not material, that involves management or other HP employees who have a significant role in such controls.

- The Committee will oversee HP's ethics and compliance programs with respect to legal and regulatory requirements, and review with management and the Director of Internal Audit the results of their review of compliance with applicable laws, regulations and listing standards, HP's code of conduct (known as "Integrity at HP") and internal audit reports. The Chief Ethics and Compliance Officer shall have the express authority to communicate personally to the Committee, including authority to promptly communicate personally to the Committee on any matter involving criminal conduct or potential criminal conduct. The Chief Ethics and Compliance Officer shall report to the Committee no less than annually on the implementation and effectiveness of the ethics and compliance program.

- The Committee will review risks facing HP and management's approach to addressing these risks, including significant risks or exposures relating to litigation and other proceedings and regulatory matters that may have a significant impact on HP's financial statements, and discuss policies with respect to risk assessment and risk management.

43.    The Individual Defendants failed to adhere to the Code of Conduct by issuing false and materially misleading public statements and filings with the SEC related to the sales practices

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

of HP's Supplies Division within its Printing Segment. Furthermore, the Audit Committee Defendants failed to perform the duties required by the Audit Charter by allowing the Company to issue materially false and misleading statements regarding HP's sales practices and the viability of its Printing Segment.

## SUBSTANTIVE ALLEGATIONS

**Background**

44.     Hewlett-Packard is a technology company founded in 1939 based in the United States. On November 1, 2015, HP spun off from Hewlett-Packard and retained its ticker, HPQ, and its legacy Printing and Personal Systems businesses.

45.     HP has three segments: Personal Systems, Printing, and Corporate Investments. Of these three segments, the two major revenue creators are: Personal Systems and Printing. The Personal Systems Segment provides commercial and consumer computers and related software, support, and services. The Printing Segment consists of the Supplies Division, as well as consumer and commercial hardware. The Supplies Division sells supplies for printers, such as ink and toner.

46.     At the start of the Relevant Period, the Supplies Division was not only a major driver of HP's revenue, but was vital to the Company's success. Indeed, as Defendant Lores unambiguously explained: "We lose money on printers. We make money on supplies." Even today, the Supplies Division accounts for more than half of HP's net revenues in its Printing Segment.

47.     Before the spin off, Hewlett-Packard's Printing Segment's revenue had been declining for years, but the Supplies Division had high profit margins. Hewlett-Packard relied on the Supplies Division to invest in other divisions within the Printing Segment. Post spin-off, the Company became smaller, creating more responsibility for the Supplies Division to pull more than its own weight. This created pressure on managers in the Supplies Division to use improper sales techniques, including, as described further below: managers offering additional discounts to Tier 1 Channel Partners to sell to Tier 2 Channel Partners; managers pulling sales forward during the end of a quarter by offering steep discounts; and managers selling products outside of their regions. These improper sales techniques made it appear that the Supplies Division was meeting its budget but would eventually backfire and reduce profit margins worldwide.

48.     November 2015 through June 2016, the Individual Defendants caused the Company to make materially false and misleading statements regarding HP's financial performance. The Individual Defendants gave the investing public positive financial results but did not disclose the true driver behind these temporary positive results. The Company in fact was using a flawed strategy—known as a "push model"—that would eventually decrease revenues and profits.

49.     The push model utilized a multi-tier channel but would generally only sell products directly to its "Tier 1" distributors. The Tier 1 distributors would then sell the products through to "Tier 2" resellers, which would either sell to end users or to resellers further down the distribution chain. Implementing the push model, HP used sales incentives to drive Supplies Division inventory to the Company's channel partners. Once inventory had pushed to channel partners, Sales Managers would use "contra" dollars, a combination of marketing spend and discounts, to: (i) promote the inventory through the channel to end users; and (ii) make sure they always met their sales targets by the end of the quarter.

50.     HP measured its channel inventory by using a calculation called WOS, which divided HP's Tier 1 channel inventory by an average of previous weeks' sales in order to give an indication of how many weeks of inventory were in the channel if sales continued at the recent pace. The Company reported WOS as a range, which it used as a proxy for its channel health, and would disclose to the investing public whether it was within or above its internal targeted WOS range. Internally, however, HP referred to the upper end of its WOS range as a ceiling, and regional managers were expected to keep their channel inventory below the WOS ceiling.

51.     HP's Finance Department, led by Defendant Lesjak, set the target WOS levels (*i.e.*, channel inventory ceilings) annually, and the Company's finance team monitored WOS targets on a weekly basis using "flash" reports. These "flash" reports compared quarterly metrics, including WOS, against HP's budget based on the actual performance of past weeks and the anticipated performance for future weeks.

52.     Moreover, although channel inventory was affected by the inventory of both Tier 1 and Tier 2 channel partners, the Individual Defendants failed to disclose that HP calculated WOS using only Tier 1 channel inventory. Excluding Tier 2 channel inventory from the WOS calculation

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

allowed sales managers to have a higher ceiling and thus conceal the increased total channel inventory.

53.     In late 2015 and early 2016, HP's management placed increasing pressure on sales managers to stay below the WOS ceiling. Accordingly, the sales managers offered additional discounts to Tier 1 Channel Partners to sell to Tier 2 Channel Partners. At this point the inventory channel became so flooded that Tier 2 Channel Partners requested very high discounts or refused to buy the products. This appeared to keep regions at or below their WOS ceiling, but only because Tier 2 channel inventory was not included in the calculation. Combined with the steeper discounts, this strategy continued to flood the channel inventory which would ultimately reduce future revenue. Furthermore, some sales managers within the Printing Segment pulled sales forward from future quarters by offering high discounts on products at the end of a quarter.

54.     High level HP executives and management were aware of this conduct. For example, Defendant Lores has admitted publicly that it was his responsibility to monitor Tier 1 and Tier 2 channel inventory levels. In addition, Defendants Weisler and Lesjak had substantial experience in monitoring HP's channel inventory for signs of unhealthy, excess levels.

55.     HP conducted business in three regions: the Americas ("AMS"), Asia Pacific and Japan ("APJ"), and Europe Middle East Africa ("EMEA"). From 2015 through June 2016, some APJ sales managers sold to resellers outside the APJ territory with higher-than-normal discounts. When APJ managers sold products in the EMEA territory, it caused a chain reaction which ended with EMEA sales managers invading the AMS territory. This cannibalization of sales further increased the channel inventory, but the Individual Defendants failed to disclose this practice to the market.

**Defendants' False and Misleading Statements**

56.     On November 5, 2015, after the market closed, HP filed a Form 8-K with the SEC that included pro forma consolidated financial statements reflecting HP's revenue, gross margin, and profit following the Company's spinoff from HPC. The November 5, 2015 Form 8-K incorporated by reference the consolidated financial statements, accompanying notes, and Management's Discussion and Analysis of Financial Condition and Results of Operations from the Form 10-Q for

13

the third quarter of fiscal 2015 ("Q3 2015"), ended July 31, 2015. The November 5, 2015 Form 8-K and incorporated financial statements reported pro forma gross margin of 19.3% and operating profit margin of 8.2% for the nine months ended July 31, 2015, Printing segment operating profit margin of 17.8% for Q3 2015, and stated, in relevant part:

> Gross margin was 23.8% ($6.0 billion) and 24.0% ($6.6 billion) for the three months ended July 31, 2015 and 2014, respectively. The 0.2 percentage points decrease in gross margin was due primarily to competitive pricing pressures in Printing, EG and Personal Systems and a higher mix of ISS products in EG.
>
>         ***
>
> In Printing, we are experiencing the impact of the growth in mobility and demand challenges in consumer and commercial markets. We are also experiencing an overall competitive pricing environment due to aggressive pricing from our Japanese competitors, given the weakness of the Japanese Yen.
>
>         ***
>
> For the three months ended July 31, 2015, total gross margin decreased 0.2 percentage points. From a segment perspective, the primary factors impacting gross margin performance are summarized as follows:
> Printing gross margin decreased due primarily to a competitive pricing environment in hardware.
>
>         ***
>
> Printing earnings from operations as a percentage of net revenue decreased by 0.6 percentage points for the three months ended July 31, 2015 due to a decline in gross margin . . . .

57. On November 24, 2015, HP issued an earnings release announcing its financial results for the fourth quarter of fiscal 2015 ("Q4 2015") and FY 2015. The same day, HP held a conference call for analysts, media representatives, and investors during which Defendants Weisler and Lesjak discussed the quarterly results. As set forth below, Defendants made materially misleading statements in the earnings release and on the earnings call regarding Supplies pricing, gross margins, and operating profits and/or omitted material information regarding the pull-in scheme, which caused the statements made to be materially misleading.

58. In the November 24, 2015 earnings release, Defendants reported gross margins of 24.7% for Q4 2015 (compared to 24.6% for fourth quarter fiscal 2014 ("Q4 2014")) and 24.0% for FY 2015 (compared to 23.9% for FY 2014) and Printing segment operating profit margin of 17.4% for Q4 2015 (compared to 17.8% for Q3 2015 and 18.2% for Q4 2014). On the November 24, 2015 earnings call, Defendant Weisler blamed HP's performance on "currency movements":

Turning to Printing, we saw accelerated revenue declines across hardware and supplies and there have been a couple of factors that have changed since the Security Analyst Meeting. The most significant factor was the continued effects of currency movements that have accelerated pricing pressures even more than we expected in certain profitable segments of the printing markets.

59.    With respect to Supplies pricing, Defendant Weisler assured investors on the call that HP did not rely on discounting prices to stay competitive: "[W]e can't compete on price alone. So we are balancing our pricing actions with increased marketing and sales activity to stimulate demand." Likewise, Defendant Lesjak stated that Defendants would be "careful about what we do from a supplies pricing perspective."

60.    On the same earnings call, Defendant Lesjak stated that "[f]rom an operating profit perspective, [HP] delivered 17.4%, down 0.8 points year-over-year. Currency headwinds and competitive pricing were only partially offset by strong supplies mix."

61.    On December 16, 2015, HP issued its Form 10-K for FY 2015, which was signed by Defendants Weisler and Lesjak. The 10-K included the following false and misleading statements about Supplies pricing, gross margins, and operating profits, but continued to conceal the pull-in scheme and its effect on pricing, gross margin, and operating profits:

In Printing, we are experiencing the impact of the growth in mobility and demand challenges in consumer and commercial markets. We are also experiencing an overall competitive pricing environment due to aggressive pricing from our Japanese competitors, given the weakness of the Japanese yen.

*** 

From a segment perspective, the primary factors impacting gross margin performance are summarized as follows:

***

Printing gross margin decreased due primarily to a competitive pricing environment in hardware and unfavorable currency impacts[.]

***

Printing earnings from operations as a percentage of net revenue remained flat for fiscal 2015 due to a decline in gross margin, offset by lower operating expenses as a percentage of net revenue. The decline in gross margin was due primarily to a competitive pricing environment in hardware and unfavorable currency impacts, the effects of which were partially offset by a favorable mix of ink and graphics supplies and favorable currency impacts from the Japanese yen.

62.    The 2015 10-K was signed by Individual Defendants Weisler, Lesjak, Banerji, Bass, Bennett, Bergh, Brown-Philpot, Citrino, Gupta, Mobley, Suresh, and Whitman. Defendants Weisler

and Lesjak also certified, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that the 2015 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that the information contained in the 2015 10-K "fairly presents, in all material respects, the financial condition and results of operations of HP Inc."

63.     On February 24, 2016, HP issued an earnings release announcing its financial results for Q1 2016, ended January 31, 2016. The same day, HP held a conference call for analysts, media representatives, and investors during which Defendants Weisler and Lesjak discussed the quarterly results. Defendants made materially false and misleading statements in the earnings release and on the call regarding Supplies pricing, gross margins, and operating profits and/or omitted material information regarding the pull-in scheme, which caused the statements made to be materially misleading.

64.     In the February 24, 2016 earnings release, Defendants reported gross margin of 18.7% for Q1 2016 (compared to 19.2% for Q4 2015 and 19.4% for Q1 2015) and Printing segment operating profit margin of 17.0% for Q1 2016 (compared to 18.8% for Q1 2015).

65.     On the same day, the Company held an earnings call for analysts and investors. During the earnings call, Defendant Weisler stated, in relevant part:

> Shifting to supplies. The year-over-year revenue was down 8% in constant currency. The factors driving the decline that were expected going into the quarter were installed-base erosion from declining hardware sales and channel inventory adjustments. The factors that varied from our plan were pricing and aftermarket share. Supplies pricing was up, given adjustments we made to offset some of the unfavorable currency, but not as much as planned given necessary discounting in the quarter to combat aftermarket alternatives. Our aftermarket share was more pressured than expected for toner.

66.     Defendant Lesjak reported Printing Segment net revenue of $4.6 billion and Printing Segment operating profit margin of 17%. She further stated, in relevant part:

> Supplies channel inventory was slightly above the range…
> ***
> Our reported supplies revenue is expected to decline double digits year over year, which is incorporated in our outlook of the stabilization in constant currency by the end of 2017.
> ***
> And then from a channel inventory perspective on the hardware side, we are in a very healthy position. And so there shouldn't be any more channel inventory hardware units adjusted, that need to be adjusted. On the supply side, we are still slightly above our kind

16

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

of targeted range. And so we do need some additional channel inventory correction in Q2, but we will be through that in – by the end of the first half.

\*\*\*

On the Printing side, really, the margin – so we delivered a margin of 17%, down 1.8 points. And the pressure there was really around a very competitive pricing environment related to currency and then also just the strength of the dollar from a currency perspective that was a bigger headwind than the tailwind from supplies – favorable supplies and hardware mix. And they also had struggled with – or we also struggled with lots of operating expense leverage there, again, back to the fact that we've got to get our cost structure, our nonrevenue-generating cost structure down to operate in what we're calling the new normal. This is the environment in which we have to win and succeed. (Emphasis added.)

67.     Following the press release and earnings call, HP's stock price declined 4.4% to close at $10.34 per share on February 25, 2016. Weisler's and Lesjak's positive statements about the outlook for the Supplies Division and their failure to disclose the overflowing channel inventory due to sales practices unknown to the public kept the stock from declining further. For instance, Defendant Lesjak represented on the earnings call that the correction in channel inventory would be completed "by the end of the first half" of the second quarter and stated that the Supplies Division "made solid progress on [its] core and growth initiatives."

68.     On March 3, 2016, HP issued its Form 10-Q for Q1 2016, which was signed by Defendants Weisler and Lesjak. The 10-Q included the following misleading statements and omissions about Supplies pricing, gross margins, and operating profits, but continued to conceal the pull-in scheme and its effect on pricing, gross margin, and operating profit:

In Printing, we are experiencing the impact of demand challenges in consumer and commercial markets. We are also experiencing an overall competitive pricing environment due to aggressive pricing from our Japanese competitors, given the weakness of the Japanese yen.

\*\*\*

HP gross margin decreased by 0.7 percentage points for the three months ended January 31, 2016 as compared to the prior-year period. The primary factors impacting gross margin performance were unfavorable currency impacts and a competitive pricing environment across LaserJet and Inkjet businesses, partially offset by favorable commodity costs, pricing and mix in Personal Systems and a higher proportion of ink and graphics supplies sales in Printing.

\*\*\*

Printing earnings from operations as a percentage of net revenue decreased by 1.8 percentage points for the three months ended January 31, 2016 as compared to the prior-year period due to a decline in gross margin and an increase in operating expenses as a percentage of net revenue. The gross margin decline was due primarily to unfavorable

currency impacts and competitive pricing across LaserJet and Inkjet businesses, partially offset by a higher proportion of ink and graphics supplies sales.

69.     The 1Q 2016 10-Q was signed by Defendant Lesjak. Additionally, Defendants Weisler and Lesjak signed SOX certifications representing, among other things, that the 1Q 2016 10-Q "fairly presents, in all material respects, the financial condition and results of operations of HP Inc."

70.     In the May 25, 2016 earnings release, Defendants reported gross margin of 19.4% for Q2 2016 (compared to 19.7% for second quarter fiscal 2015 ("Q2 2015")) and Printing segment operating profit margin of 17.3% for Q2 2016 (compared to 17.8% for Q2 2016).

71.     On the May 25, 2016 earnings call, Defendant Lesjak stated that "Gross margin of 19.4% was down 0.3 points year-over-year, driven by unfavorable currency and competitive pricing." He further noted that "[o]perating profit for printing was 17.3%, down 0.5 points year over year, driven by currency and competitive pricing, partially offset by operational improvements, favorable hardware mix, and divestiture gains."

72.     During the May 25, 2016 call, Lesjak responded to an analyst question regarding Printing operating profit margins, and again blamed "currency" and "competitive pricing" for the disappointing results, stating that "[o]perating losses for Printing were down 50 basis points, as you mentioned, and that's really driven by currency and the very competitive pricing environment we saw.

73.     On June 3, 2016, HP issued its Form 10-Q for Q2 2016, which was signed by Defendants Weisler and Lesjak. The 10-Q included the following misleading statements and omissions about Supplies pricing, gross margins, and operating profit, but continued to conceal the pull-in scheme and its effect on pricing, gross margins, and operating profit:

> In Printing, we are experiencing the impact of demand challenges in consumer and commercial markets. We are also experiencing an overall competitive pricing environment due to aggressive pricing from our Japanese competitors.
>
> ***
>
> For the three and six months ended April 30, 2016, our gross margin decreased 0.3 percentage points and 0.6 percentage points, respectively as compared to the prior-year periods. The primary factors impacting gross margin performance were unfavorable currency impacts and a competitive pricing environment in Printing, the effects of which

were partially offset by favorable commodity costs, product mix and pricing in Personal Systems.

\*\*\*

Printing earnings from operations as a percentage of net revenue decreased by 0.5 percentage points for the three months ended April 30, 2016 as compared to the prior-year period due to a decline in gross margin and an increase in operating expenses as a percentage of net revenue. The gross margin decline was due primarily to net unfavorable currency impacts and a competitive pricing environment, the effects of which were partially offset by operational improvements, higher proportion of graphics supplies and favorable mix of Inkjet printers.

\*\*\*

Printing earnings from operations as a percentage of net revenue decreased by 1.2 percentage points for the six months ended April 30, 2016 as compared to the prior-year period due to a decline in gross margin and an increase in operating expenses as a percentage of net revenue. The gross margin decline was due primarily to net unfavorable currency impacts and competitive pricing pressure, partially offset by operational improvements, favorable mix of Inkjet printers and a higher proportion of graphics and ink supplies.

74.    Defendant Lesjak signed the 2Q 2016 10-Q. Additionally, Weisler and Lesjak signed SOX certifications, assuring investors that the 2Q 2016 10-Q "fairly presents, in all material respects, the financial condition and results of operations of HP Inc."

75.    Although the 2Q 2016 10-Q falsely claimed that the channel inventory was being reduced, the reality was that the channel inventory was being flooded. Further, the 2Q 2016 10-Q made the misleading claim that "competitive pricing" was causing net revenues to fall.

76.    Individual Defendants' representations about the Company's revenues, profits, and prospects, as set forth in paragraphs 45 – 68, *supra*, were false and misleading because they failed to disclose that the Company was: (1) calculating WOS by excluding Tier 2 Channel Partners; (2) offering additional discounts to Tier 1 Channel Partners to sell to Tier 2 Channel Partners; (3) pulling sales forward during the end of a quarter by offering steep discounts; and (4) cannibalizing sales because managers were selling outside their territories. Although the Individual Defendants caused the Company to artificially inflate the performance of HP's Supplies business during the Relevant Period, the truth was that HP's sales managers were flooding the channel inventory, further driving down demand and creating the need for steeper discounts, which would ultimately lead to substantial losses of profits.

**The Truth Begins to Emerge**

77.     On June 21, 2016, after the market closed, HP held a conference call for analysts and investors titled "HP Printing Update Conference Call." The purpose of the call was to update the public on the change in HP's Printing Segment sales model. Defendants Weisler and Lesjak informed the investing public that HP would reduce Supplies Division channel inventory by $450 million and, as a result, Supplies Division net revenue would be reduced by $450 million over the third and fourth quarters of the 2016 fiscal year. The $450 million reduction would be on top of a $250 million reduction in revenue the Company took in the second fiscal quarter of 2016, amounting to a massive $700 million reduction in revenue during the course of the 2016 fiscal year.

78.     During the call, Defendant Weisler explained how the reduction in the level of supplies in the inventory channel over two quarters would ultimately shift the strategy from a "push model to a pull model driven by market demand."

79.     Defendant Lesjak claimed she was "convinced that operational change is required to manage the business differently going forward, which includes onetime investment to reduce the supplies channel inventory levels globally" and estimated that the operational impact of the reduction in channel inventory would be "$225 million in each of Q3 and Q4" of fiscal 2016.

80.     On the same conference call, Defendant Lores, then President of Imaging & Printing, stated:

> Thank you. I want to take a moment to discuss how will we manage this plan operationally. We are taking 4 actions: first, we will reduce Tier 1 and Tier 2 supplies channel inventory levels during Q3 and Q4. Following this onetime reduction of inventory, we will reduce and tighten the desired ranges for ink and toner in each region. It will be critical as it is today for me to hold the sales teams accountable to remain within the ranges going forward. You can expect us to report on this during the quarterly earning calls as we have done in the past. Second, to add further control, we will align channel compensation and programs to our market demand selling motion, and we'll shift from compensating on sell-in to a combination of sell-through and sellout volumes. Third, as Dion discussed, we are changing our pricing policy to achieve better consistency of pricing globally. Repricing our promotion decisions from HP supplies will now be managed centrally at the global and regional levels to align timing and to maintain our value proposition. We will reduce the frequency on discount levels of end-user promotions and eliminate low value at channel promotions. Our Big Data capabilities give us a very good understanding of the effectiveness of our activities. Going forward, we will leverage this information to focus only on high return on investment targeted promotions. We will institute very tight controls to ensure adherence to policy and escalation processes to resolve. Finally, by shifting some

20

investment dollars from price promotions to end-user marketing, we will be able to demonstrate the value of HP original supply, driving loyalty and supplies share. Taking these actions now is critical to effectively respond to the changes we are experiencing in the global market and to drive the long-term health of the Printing business.

81.     In response to an analyst's question regarding the magnitude of the reduction in inventory, Defendant Weisler stated as follows:

So we've done a significant amount of analysis through the collection of Big Data. We've spoken to -- at length to our channel partners. We've analyzed all areas of the business to determine what generates both -- at a Tier 1 level and a Tier 2 level, what generates market demand so that we move from this push model to a pull model. So we're fairly confident that the sums that we've talked about in the prepared remarks are the right amount of inventory to reduce in order to effect that pivoting model. I will also mention that we've spoken to a number of other organizations that operate similar business models, and we've triangulated with them as we were seeing the effects of the omnichannel impact to business in order to test some of our thinking in this space.

82.     Defendant Lesjak remarked that the reduction in inventory was "fairly material because, as I mentioned, it's about $450 million over a couple of quarters here, $225 million each quarter in terms of revenue. So it's a fairly substantial change to channel inventory."

83.     During the call, an analyst from Sanford C. Bernstein & Co., LLC posed the following questions:

I have 2 questions, why you consider the sale of the marketing organization assets as something that's attributable to non-GAAP income and why that's not excluded from your results? And then secondly, we had an earnings call less than 4 weeks ago and you said you were comfortable with supplies' inventory levels. Given all the analysis that you have done on this, I'm surprised you said because we're taking this action. And then they are even more significantly up in 2018 because this benefit ramp.

84.     Defendant Weisler responded with the following:

And on the second question, Toni, I would say that we've said that the separation would provide opportunities to optimize our business as we balance focus on short and long-term operational decisions. And we believe this is the right thing to do now for the long-term stability and profitability of the Printing business. An operational shift towards a market-driven demand model is going to deliver lower inventories and increased efficiencies across the system, ultimately resulting in sort of greater stability and predictability in the Supplies revenue. And by reinvesting the proceeds from the divestiture now, we can accelerate the change and capitalize on the benefits sooner. We did, as you will recall on our last earnings call, take down our channel inventories last quarter. We could have done this over several quarters, but we believe that you never wish you went more slowly. And given the sale of these assets, we believe that we have the ability to capitalize on the benefits sooner. And as a result of that, we're making this decision to invest.

21

85.    An analyst from Wells Fargo asked:

Can you just talk about the confidence you have in the increased marketing driving sales, maybe dive a little bit deeper into that? And then the 3-year payback period on the investment is probably a little bit longer than I would have anticipated. Can you just maybe walk us through what we should be expecting over those 3 years and how the benefits flow through?

86.    Defendant Lesjak responded:

So then to specifically address your question around the 3-year payback, the payback really comes from 2 primary sources. The first one is that with the incremental marketing and really driving sales on the basis of the value, we do expect that, over time, our share -- our HP-branded aftermarket supply share, will go up. And that, of course, will contribute incremental margin. But it's not an immediate effect, and so it will take some time for that to ramp. And then the second benefit is just the fact that we will be -- we will not be paying as many discount dollars to get the product into the channel and then to move it out of the channel. And so in total, we will have lower discounts, and that also contributes to the payback. It does ramp. It ramps -- it starts to ramp in '17, which is why the absolute dollars from a supplies perspective in terms of revenue in '17 are higher because we're taking this action. And then they are even more significantly up in
2018 because this benefit ramp.

87.    Following the June 21, 2016 call, the price of HP stock declined 5.4% to close at $12.61 per share on June 22, 2016.

88.    Although Defendants attributed the channel inventory issues and revenue and margin reductions to unfavorable currency impacts, competitive pricing, and a change in inventory modeling, they did not reveal the whole truth.

**The Truth Fully Emerges With the Issuance of the Order**

89.    On September 30, 2020, the SEC issued the Order, which finally revealed the extent of the Company's improper channel inventory management and sales practices. The Order stated that:

Beginning in the second fiscal quarter of 2015, certain regional managers at HP used a variety of incentives to accelerate, or "pull-in," sales that they otherwise expected to materialize in later quarters. In addition to the pull-ins, management in one region sold printing supplies to distributors known to be involved in selling the HP printing supplies outside of their territory (internally described as "gray marketing," and known in the region as "A-Business") causing significant margin erosion and cannibalization of HP sales in other regions.

*Id.* at ¶ 2.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

90.     The Order further revealed that:

Despite the risk that these sales practices could negatively impact HP's operating profit in future quarters, HP did not disclose to the market during the relevant time period that its use of the pull-ins and A-Business were causing decreased margins and increased channel inventory. HP further failed to disclose facts necessary to make its channel inventory disclosures not misleading, including that the channel inventory metric employed by the company in quarterly earnings calls only included channel inventory held by channel partners to which HP sold directly and not by channel partners further down the distribution chain, thereby disclosing only an incomplete picture of HP's channel health.

*Id*. at ¶ 3.

91.     Specifically, "HP operated its push model through a multi-tiered channel . . . HP would generally sell products directly to 'Tier 1' distributors, which would then sell the products through to 'Tier 2' resellers, which would either sell to end users or to resellers further down the distribution chain." *Id*. at ¶ 12. "HP measured its channel inventory levels using Weeks of Supply (WOS)" *Id*. at ¶ 13. The SEC found that "[u]ndisclosed to the market, HP only included its Tier 1 channel partners' inventory in its WOS calculation . . . meaning that disclosures about the company's position relative to its channel inventory ceiling only told part of the story regarding HP's channel health." *Id*. at ¶ 15.

92.     The Order detailed that, "[b]eginning in early 2015 and undisclosed to the market, HP sales managers began offering increased discounts at the end of quarters to meet sales targets." *Id*. at ¶ 16. HP's engaged in this sales practice to "accelerate sales into the channel to increase quarterly revenue." *Id*. at ¶ 18. In early 2015, "HP began to see regular gaps, near the ends of the quarters between the flash [reports used to manage revenue, operating profit and WOS numbers] and budget." *Id*. at ¶ 17. Despite HP's knowledge of these gaps, it actually "accelerated [the practice] in late 2015 and early 2016." *Id*. at ¶ 19. And, according to the Order, "[t]his pattern led to a known trend of increasing channel inventory and lower margin sales that continued over multiple quarters." *Id*. at ¶ 20.

93.     The Order's findings were supported by contemporaneous emails. For example, one Printing segment manager described "'unhealthy levels of stock'" in Tier 1 and Tier 2, saying that "'we needed the Supplies Revenue & we used significant amounts of contra to push in Supplies at

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

T1 to > 2 weeks above their optimal levels.'" *Id*. at ¶ 21. Another Printing segment manager warned that "'partners do not want to carry the level of toner that we push into their warehouses . . . . [b]ut we push more toner in to help deliver on our financial plans.'" *Id*. at ¶ 22.

94.    The Order found that in 2015 through the end of the Class Period in June 2016, HP's APJ region "sold [supplies] to resellers or brokers known to sell HP supplies outside of their territory, described internally as 'gray marketing' and known in APJ as 'A-Business.'" *Id*. at ¶ 24. To do so, "APJ provided HP product to resellers and brokers within their region at higher than normal discounts, knowing they would sell the goods through a network of firms into the Middle East." *Id*. at ¶ 25. Further, to convince distributors to take on these unneeded products, HP was forced to "offer[] discounts in some instances in excess of forty percent for A-Business sales, while discounts for local distributors were in the teens." *Id*. at ¶ 26.

95.    The SEC determined that HP itself "recognized that the A-Business was 'cannibalizing' sales . . . and reducing HP's margins" in other regions, particularly in EMEA. *Id*. at ¶ 28. HP's EMEA region was forced to "combat gray marketing from the APJ region" by discounting its goods. *Id*. Exacerbating the impacts of the scheme, the "discount[ed] goods from EMEA . . . made their way into certain markets in the AMS region, causing further sales cannibalization and pressuring margins in the AMS region as well." *Id*. at ¶ 29.

96.    What is more, the Order found that "in late 2015 and early 2016, as WOS in each of HP's three regions approached or exceeded their ceilings, HP's worldwide executives demanded that regional managers . . . still deliver[] sales and operating profit targets." *Id*. at ¶ 30. As a result of pressure from HP executives, HP managers offered even more discounts to "encourage sales from Tier 1 to Tier 2," which allowed HP "to sell into Tier 1 to increase revenue without exceeding the WOS ceilings," which would have alerted investors. *Id*. at ¶ 31. Exacerbating the impacts of HP's scheme, "Tier 2 partners [who then] already had what they viewed to be sufficient inventory . . . demanded steeper discounts." *Id*. at ¶ 32.

97.    The Order found that HP:

[E]ngaged in "simultaneous sell-in/sell-through deals," also called "in-and-out sales," described by one HP regional sales manager as "indent supplies that sells-in [to Tier 1] and through [to Tier 2] immediately" which had "no WOS implications and helps with our

profit status." Nevertheless, because the sales were based on meeting HP's budgeted numbers and not on specific end-user demand, they further increased HP's Tier 2 channel inventory. [And] [b]ecause HP's disclosures only described its Tier 1 channel inventory, this additional inventory was not part of HP's channel inventory disclosures.

*Id*. at ¶ 33.

98.     Accordingly, as a result of the gray marketing conduct described above, the Order concluded:

Between November 2015 and June 2016, HP's disclosures regarding channel inventory and gross margin omitted material information regarding the impact of the above mentioned practices on these metrics, causing HP's disclosures to be incomplete and misleading. As a result of the conduct described above, Respondent omitted material information in: (1) its annual report on Form 10- K for fiscal year 2015; (2) its quarterly reports on Form 10-Qs for the first and second quarters of 2016; and (3) on quarterly earnings calls during that time period.

* * *

[I]n periodic securities filings between November 2015 and June 2016, HP repeatedly disclosed decreases in its operating profits caused by declines in HP's gross margin. In each instance, HP provided various reasons for the decline in gross margin but omitted the material impact that pull-ins and the A-Business were having on HP's gross margins. Specifically, in its quarterly securities filings for the first two quarters of 2016, HP disclosed that its decreasing gross margins were the result of "competitive pricing environment" and "unfavorable currency impacts," but omitted from its description the impact that its use of pull-ins and A-Business was having on its gross margins.

* * *

In addition, in several instances where HP's channel inventory was above its target range, HP omitted from the [channel inventory] disclosure [on quarterly earnings calls between November 2015 and June 2016] the material impact that pull-ins and A-Business were having on HP's channel inventory. Specifically, on its quarterly earnings calls in November 2015 and February 2016, HP omitted from its channel inventory disclosure the impact that pull-ins and A-business had in causing channel inventory to increase above the target range.

*Id*. at ¶¶ 39, 43, 45.

99.     As a result of these findings, the Order concluded: [O]n quarterly earnings calls between November 2015 and June 2016, HP repeatedly made disclosures regarding the level of its channel inventory relative to the company's "target weeks of supply range." . . . However, . . . HP's failure to describe its overall channel inventory provided the market with only a partial and misleading picture of HP's channel health and caused HP's channel inventory disclosures to be materially misleading. *Id*. at ¶ 44.

100.    The Order, which noted that the findings therein were "true and admitted by [HP]," required HP to pay a $6 million civil monetary penalty and to cease and desist from committing or causing any violations of Section 17(a)(2) and (3) of the Securities Act and Section 13(a) of the Exchange Act and Rules 13a-1, 13a-13, 13a-15, and 12b-20 thereunder.

**The False and Misleading Proxy Statements**

101.    In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Individual Defendants caused the Company to issue false and misleading proxy statements during the Relevant Period. There were five Form DEF14As filed with the SEC during the Relevant Period: (i) the February 19, 2016 Form DEF14A (the "2016 Proxy"); (ii) the February 17, 2017 DEF14A (the "2017 Proxy"); (iii) the February 26, 2018 DEF14A (the "2018 Proxy"); (iv) the February 26, 2019 DEF14A (the "2019 Proxy"); and (v) the March 26, 2020 DEF14A (the "2020 Proxy").

102.    The 2016 Proxy, the 2017 Proxy, the 2018 Proxy, the 2019 Proxy, and the 2020 Proxy are collectively referred to herein as the "Proxies." Most or all the Proxies had identical or substantially similar language detailed below.

103.    HP touted its stockholder outreach program:

We believe that effective corporate governance should include regular, constructive conversations with our stockholders. Over the past year, the Board has continued to engage with stockholders both directly and through the ongoing video interview series. The Board has also sought and encouraged feedback from stockholders about our corporate governance practices by conducting additional stockholder outreach and engagement throughout the year.

104.    HP touted its Board Risk Oversight Program in each of the proxies:

The Board, with the assistance of committees of the Board as discussed below, reviews and oversees our enterprise risk management ("ERM") program, which is an enterprise-wide program designed to enable effective and efficient identification of, and management visibility into, critical enterprise risks and to facilitate the incorporation of risk considerations into decision making. The ERM program was established to clearly define risk management roles and responsibilities, bring together senior management to discuss risk, promote visibility and constructive dialogue around risk at the senior management and Board levels and facilitate appropriate risk response strategies. Under the ERM program, management develops a holistic portfolio of our enterprise risks by facilitating business and function risk assessments, performing targeted risk assessments and incorporating information regarding specific categories of risk gathered from various internal HP organizations. Management then develops risk response plans for risks

26

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

categorized as needing management focus and response and monitors other identified risk focus areas. Management provides regular reports on the risk portfolio and risk response efforts to senior management and to the Audit Committee. The Board oversees management's implementation of the ERM program, including reviewing our enterprise risk portfolio and evaluating management's approach to addressing identified risks.

105.    HP underscored its compliance with Exchange Act requirements:

We have an Audit Committee established in accordance with the requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The Audit Committee represents and assists the Board in fulfilling its responsibilities for overseeing our financial reporting processes and the audit of our financial statements.

106.    HP touted the integrity of its Audit Committee:

The Audit Committee represents and assists the Board in fulfilling its responsibilities for general oversight of the integrity of HP's financial statements, HP's compliance with legal and regulatory requirements, the independent registered public accounting firm's qualifications and independence, the performance of HP's internal audit function and independent registered public accounting firm, and risk assessment and risk management. The Audit Committee manages HP's relationship with its independent registered public accounting firm (which reports directly to the Audit Committee). The Audit Committee has the authority to obtain advice and assistance from outside legal, accounting or other advisors as the Audit Committee deems necessary to carry out its duties and receives appropriate funding, as determined by the Audit Committee, from HP for such advice and assistance.

HP's management is primarily responsible for HP's internal control and financial reporting process. HP's independent registered public accounting firm, Ernst & Young LLP, is responsible for performing an independent audit of HP's consolidated financial statements and issuing opinions on the conformity of those audited financial statements with United States generally accepted accounting principles and the effectiveness of HP's internal control over financial reporting.

107.    HP noted that its Audit Committee approved the respective Forms 10-K:

In this context, the Audit Committee hereby reports as follows:

1.  The Audit Committee has reviewed and discussed the audited financial statements with HP's management.

2.  The Audit Committee has discussed with the independent registered public accounting firm the matters required to be discussed under the rules adopted by the Public Company Accounting Oversight Board ("PCAOB")

3.  The Audit Committee has received from the independent registered public accounting firm the written disclosures and the letter required by the applicable requirements of the PCAOB regarding the independent registered public accounting firm's communications with the Audit Committee concerning

independence and has discussed with the independent registered public accounting firm its independence.

4.  Based on the review and discussions referred to in paragraphs (1) through (3) above, the Audit Committee recommended to the Board, and the Board has approved, that the audited financial statements be included in HP's Annual Report on Form 10-K for the fiscal year ended October 31, 2015, for filing with the SEC.

The undersigned members of the Audit Committee have submitted this Report to the Board of Directors.

108.    HP informed investors of its code of conduct. The Proxies noted that "[w]e maintain a code of business conduct and ethics for directors, officers and employees known as our Standards of Business Conduct, which is available on our website" and provided the link. The Proxies further noted that "[f]f the Board grants any waivers from our Standards of Business Conduct to any of our directors or executive officers, or if we amend our Standards of Business Conduct, we will, if required, disclose these matters via updates to our website on a timely basis."

109.    The Proxies were false and misleading because, while they assured investors that the Board would reach out to stockholders and keep them informed, and that its Audit Committee reviewed filings, that was not the case as revealed by the Order. The Order clearly shows that the Individual Defendants allowed each other and the Company to issue false and materially misleading statements during the Relevant Period. The Individual Defendants also recommended shareholders re-elect directors that were in place while the improper sales practices occurred from November 2015 through June 2016.

## BREACHES OF DUTIES

110.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of HP, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

111.    The Individual Defendants breached their duty of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information regarding the extensive problems the Company was sure to encounter because of the improper sales practices described

herein. The Individual Defendants also breached their duty of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused HP substantial damage.

112.     The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The Audit Committee Defendants breached their duty of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee HP's public statements and internal control functions.

113.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of HP, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, because of the Individual Defendants' improper course of conduct, the Company is now the subject of the Federal Securities Class Action, which alleges violations of federal securities laws. As a result, HP has expended, and will continue to expend, significant sums of money.

## DAMAGES TO HP

114.     The improper sales practices and failure to disclose said practices have exposed the Company to myriad reputational and financial damages, including but not limited to:

- Possible restatements and goodwill impairments;
- Liability arising from the Federal Securities Class Action;
- Liability arising from the Order;
- The loss of credibility with customers and suppliers; and
- Legal costs associated with litigation, investigations, and restatements.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

115.     Plaintiff brings this action derivatively and for the benefit of HP to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of HP, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act.

116.    HP is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

117.    Plaintiff is, and has been continuously at all relevant times, a stockholder of HP. Plaintiff will adequately and fairly represent the interests of HP in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

118.    Plaintiff incorporates by reference and re-alleges each allegation stated above as if fully set forth herein.

119.    A pre-suit demand on the Board of HP is futile and, therefore, excused. At the time of filing this action, the Board consists of Individual Defendants Lores, Alvarez, Banerji, Bennett, Bergh, Brown-Philpot, Burns, Citrino, and Suresh (the "Director Defendants"), along with Bruck Broussard, Kim K.W. Rucker, Richard L. Clemmer and Judith Miscik, who are not defendants in these proceedings. Plaintiff needs only to allege demand futility as to a majority of the Directors who are on the Board at the time this action is commenced.

120.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme in which they engaged, knowingly or recklessly, to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

121.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

122.    Demand on Defendants Banerji, Bennett, Bergh, Brown-Philpot, Burns, Citrino, and Suresh is futile because each has served as a Company director since November 1, 2015, and thus

30

(1) signed and thus personally made the false and misleading statements in the 2015 10-K; and (2) has received and continues to receive compensation for their directorship of HP. As a result, each has breached fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon that director is futile and, therefore, excused.

123.     Demand on Defendants Lores and Banerji is futile for the additional reason that they received total proceeds of $18.2 million and $1.3 million, respectively, for sales of stock during the Relevant Period.

124.     Demand on Defendant Alvarez is futile because she has served as a Company director since February 2016. She has received and continues to receive compensation for her role as a director as described herein. For these reasons, Defendant Alvarez breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

125.     Demand on Defendant Lores is futile because he has served as a Company director and CEO since November 1, 2019. He has received and continues to receive compensation for his role as a director described herein. Further, the Company filed Form Def 14A with the SEC on February 22, 2021 (the "2021 Proxy"). The 2021 Proxy acknowledges that Lores is not an independent director and he is a named defendant in the Federal Securities Class Action. Lores also made the false and materially misleading statements on the June 21, 2016 conference call when he was the President of Imaging & Printing. For these reasons, Defendant Lores breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

126.     As trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets. For the above reasons, these Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

127.     The Director Defendants have longstanding business relationships with each other and the Individual Defendants, which means they cannot act independently and in the best interests of the Company. Before the spin-off, Individual Defendants Banerji, Bennett, Gupta, and Whitman each served as directors at Hewlett-Packard together. Prior to the spin off, Whitman served as Chairman of the Board, President, and CEO of Hewlett-Packard; Lesjak served as Executive Vice President and CFO of Hewlett-Packard; Weisler served as Executive Vice President, Printing and Personal Systems Group of Hewlett-Packard; and Keogh served as executive Vice President and Chief Human Resources Officer of Hewlett-Packard. These conflicts mean these defendants could not adequately monitor the Company's operations and internal controls, and call into question the Individual Defendants' conduct. Thus, demand upon the Director Defendants would be futile.

128.     Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's accounting and financial reporting practices and system of internal controls.

129.     The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, and allowed the Company to issue materially false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

130.     In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act. In further violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of

Conduct. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

131.    HP has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for HP any part of the damages HP suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

132.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

133.    The acts complained of herein constitute violations of fiduciary duties owed by HP's officers and directors, and these acts are incapable of ratification.

## FIRST CLAIM

**Against Individual Defendants
for Breach of Fiduciary Duties**

134.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

135.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of HP's business and affairs.

136.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

137.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual

Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of HP.

138.   In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the misconduct described herein.

139.   In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure, controls, and procedures.

140.   Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements during the Relevant Period, that assured investors that HP was on track to flourish as a stand-alone company, yet failed to disclose major problems which included the following business practices: (1) calculating WOS by excluding Tier 2 Channel Partners; (2) the additional discounts offered to Tier 1 Channel Partners to sell to Tier 2 Channel Partners; (3) sales managers pulling sales forward during the end of a quarter by offering steep discounts; and (4) how sales managers from different regions were not staying within their territories and were cannibalizing sales. These were improper sales practices that were not disclosed to the public, which flooded the Company's channel inventory and risked future profits.

141.   The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

142.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

143.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

144.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

145.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, HP has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## **SECOND CLAIM**

### **Against Individual Defendants for Unjust Enrichment**

146.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

147.   By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of HP.

148.   The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from HP tied to the performance or artificially inflated valuation of HP, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct, or sold stock at artificially inflated prices during the Relevant Period.

149.   Plaintiff, as a stockholder and a representative of HP, seeks restitution from the Director Defendants and seeks an order from this Court disgorging all profits— including benefits,

performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

150.     Plaintiff, on behalf of HP, has no adequate remedy at law.

### THIRD CLAIM

**Against the Individual Defendants**
**for Violations of Section 14(a) of the Exchange Act**

151.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

152.     Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9. Specifically, the Company's Proxies violated § 14(a) and Rule 14a-9 because: (i) it misrepresented the Board's activities with respect to risk management while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; and (ii) it failed to disclose that each of the non-employee directors were interested in their own grants of discretionary compensation. The misrepresentations and omissions in the proxy statement were material to Company shareholders in voting on the proxy statement. The 2018 proxy statement solicited shareholder votes for: (i) director nominees; (ii) executive compensation; (iii) approval of the 2018 Equity Incentive Plan; and (iv) ratification of the appointment of the Company's independent auditor. The proxy statement was an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties.

153.     The 2017 Proxy, 2018 Proxy, 2019 Proxy, and 2020 Proxy also stated that the Company's directors and employees are subject to the Company's Code of Conduct. The 2017 Proxy, 2018 Proxy, 2019 Proxy, and 2020 Proxy were also false and misleading because, despite assertions to the contrary, HP's compliance with its respective codes of conduct were not followed, as the Individual Defendants made and/or caused the Company to make the false and misleading statements discussed herein.

154.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxies were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the Proxies, including, but not limited to, election of directors.

155.    The false and misleading elements of the annual Proxies led to the re-elections of Alvarez, Banerji, Bass, Bennett, Bergh, Brown-Philpot, Burns, Citrino, Gupta, Lores, Mobley, Suresh, Weisler, and Whitman, allowing them to continue breaching their fiduciary duties to HP.

156.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxies.

### FOURTH CLAIM

**Against the Individual Defendants
for Violations of Section 20(a) of the Exchange Act**

157.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

158.    The Individual Defendants, by virtue of their positions with HP and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of HP and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause HP to engage in the illegal conduct and practices complained of herein.

159.    Plaintiff, on behalf of HP, has no adequate remedy at law.

### FIFTH CLAIM

**Against the Individual Defendants
for Waste of Corporate Assets**

160.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

161.     As a further result of the foregoing, the Company will have wasted corporate assets by (1) paying a $6 million sanction by the SEC, (2) paying legal fees to defend legal actions and/or conduct internal investigations.

162.     As a result of such waste, the Individual Defendants are each liable to the Company.

**PRAYER FOR RELIEF**

**FOR THESE REASONS**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.     Declaring that Plaintiff may maintain this action on behalf of HP, and that Plaintiff is an adequate representative of the Company;

B.     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to HP;

C.     Determining and awarding to HP the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D.     Directing HP and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect HP and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies, including but not limited to (1) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and (2) a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

E.     Awarding HP restitution from Individual Defendants;

F.     Awarding extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of HP has an effective remedy;

1    G.    Awarding Plaintiff the costs and disbursements of this action, including reasonable

2  attorneys' and experts' fees, costs, and expenses; and

3    H.    Granting such other and further relief as the Court may deem just and proper.

4                              **<u>JURY DEMAND</u>**

5    Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.

6

7  DATED: January 13, 2022                **GLANCY PRONGAY & MURRAY LLP**

8                              By:   *Kevin F. Ruf*
                                   _____
9                              Kevin F. Ruf
                               1925 Century Park East, Suite 2100
10                             Los Angeles, CA 90067
                               Telephone: (310) 201-9150
11                             Email: kruf@glancylaw.com

12                             Brian P. Murray
                               Gregory B. Linkh
13                             **GLANCY PRONGAY & MURRAY LLP**
                               230 Park Avenue, Suite 358
14                             New York, New York 10169
                               Telephone: (212) 682-5340
15                             Email: bmurray@glancylaw.com
                               Email: glinkh@glancylaw.com
16

17                             Shane Rowley
                               **ROWLEY LAW PLLC**
18                             50 Main Street, Suite 1000
                               White Plains, NY 10606
19                             Telephone: (914) 400-1920
                               Email: srowley@rowleylawpllc.com
20

21                             *Attorneys for Plaintiff Gerald Lovoi*

22

23

24

25

26

27

28

## **VERIFICATION**

I, Gerald Lovoi, do hereby verify that I am a holder of common stock of HP Inc., and was a holder of such common stock at the time of the wrongs complained of in the foregoing Verified Shareholder Derivative Complaint ("Complaint"). I have authorized the filing of the Complaint. I have reviewed the Complaint. All of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date:

1-11-2022

Gerald Lovoi